Good morning ladies and gentlemen. Our first case for this morning is United States v. Adrian Tartareanu and others. Ms. Conner. May it please the court, I am Carrie Conner and I am here today on behalf of Minas Litos. I also will be speaking on the restitution issues on behalf of the Tartareanus. Mr. Beeman, who is my co-counsel, is present today and available should the court have any specific questions for him. However, we do have assessed the issues in a way that suggests that all the defendants are really in very much the same position in terms of the analysis of the restitution order. In this case, your honors, the primary issue becomes whether or not, based on the conduct of the defendants, admitted illegal conduct that they had paid for down payments of homes for purchasers, the down payments not being disclosed to the bank, whether that conduct in and of itself makes the defendants liable to Bank of America, who in fact is seeking restitution for the total amount of their losses, where it is quite clear from the record that Bank of America facilitated their own losses, as we talked about in Ferrano, co-authored their own losses in the manner in which they issued these loans independent of the fact that the down payments were not disclosed to the lender. Now, I'm not familiar with any concept of comparative negligence in restitution law. I mean, Bank of America certainly did suffer these losses, even though, as you say, they may have been, to a degree, self-inflicted. Well, but, your honor, even though we don't have, I mean, we could introduce such a concept because it is a civil case, in essence, the restitution. Well, not really. It's part of the criminal sentence, too. Well, it is part of the criminal sentence. However, the analysis is a civil one. It's a preponderance. All right, but negligence is usually not treated as comparable, something that you can weigh against intentional fraud in a civil case. I understand that, your honor, but one of our points that we did read pretty extensively is to call this a negligent victim really does not reflect the record. We have a 10% to 20% down payment that's paid and not disclosed to the lender. We then have a loan of up to 80% that is loaned by the lender. It's very clear from all of the analysis of the loan documents, which are Bank of America loan documents. We've submitted those into evidence. I believe it is Exhibit G that the court can find those on. They're cited extensively in our papers, your honors. And in those loan documents, they were so poor that the district court called them laughable. They call, the district court said that. Look, I think you have a good argument that the money shouldn't go to the Bank of America, that it's really crooked. But I don't think you have a good argument that you should keep the money. That money should go to the government. That's stolen money. That should go to the government. You shouldn't keep it. The court could certainly remand in this case and find that the but-for analysis that was done by the district court was an error. However, under the ill-gotten gains concept, could in fact reduce the restitution order to what was actually earned. I'm not talking about restitution. I'm saying you're not entitled to this money, this crooked money. It should go to the government. Well, the question becomes if we don't do it. I think you have an argument, although you're not interested in it, of course, that it should not go to the bank. Well, that's our whole point, Your Honor. But it shouldn't stay with you, with your clients, because it's stolen. The question becomes then, Your Honor, under what analysis, other than restitution, would it in fact have gone to the government? It could have been through a fine. The court decided not to impose a fine. And the court decided not to impose a fine at a time when the district court clearly was contemplating the possibility of not awarding any restitution to Bank of America, because the court recognized and spoke at length at both sentencings and at the restitution hearing that the court was extremely uncomfortable about the idea of, in essence, rewarding Bank of America, where they clearly had wrongdoing in relation to the conduct. The judge obviously got more comfortable with that idea with some further time to think about it. Let me ask you to consider the following comparison. Tell me whether you think it's valid or not. Suppose you've got, if we're dealing not with fraud but with a robbery, and the bank robbers have inside help from the branch manager. You've got an agent, maybe even an officer of the bank, who's helped facilitate the robbery. Is the bank a victim entitled to restitution? I think they would be, and the reason is because clearly the bank manager or whoever it was that was assisting from the inside is not acting on behalf of the bank. And I think that puts us in a very different situation here, because we have the bank actually taking applications very clearly. There's no issue that they're liar loans. They're not verifying any information. The loans themselves, multiple loans issued to the same people, don't even have the same information on it, processed within a very short period of time. That's true. The bank knew it was all phony. Yes. That doesn't mean you get to keep the money. That doesn't make any sense. Your clients are crooks. Why should they get to keep the money? Just because the Bank of America was also crooked. There's a possibility that the government could have done a cross appeal and suggested that it was inappropriate not to impose a fine for that very reason. The question becomes, though, as to the restitution order, how would the court have ordered the restitution to be paid to the government? Well, we have to find the government was a victim somehow, right? Right. Restitution goes to victims. That's correct. However, in the underlying case, the government never argued that. The only victim that they ended up pursuing, they claimed, was Bank of America. You may remember that Fannie Mae was initially a victim, but the government, in response to the briefing ---- The government is not a victim, but your clients should not be permitted to keep this money. If we set aside the restitution order, should we remand for a more complete resentencing since restitution is part of the whole package? I would say no, because in this case, the sentencing was actually finalized with the exception of the restitution order long ago. The government did not appeal that order. That order is final. There would be no basis. There's no procedural basis, and I'm unaware of any case which would allow the court to reopen the underlying sentencing. I'm not sure that's true at all. I mean, we have a lot of cases in which we express the notion of a sentencing package, which includes, sometimes, if it's an individual, an incarceration portion, supervised release, restitution, fines. I mean, they're all components, as we're going to be discussing later this morning, of a sentence, and so even though this amount of money for the restitution wasn't nailed down until later, which is another aspect that you've raised here, it's still all part of the package, and so maybe Judge Hamilton is right. Even without a cross-appeal, maybe the whole package would need to be looked at again. Certainly the court has the power to remand and ask the court to do that. I am unaware of any case law that would allow when restitution is determined not to have validly entered, whether we're talking about the Dolan argument or we're talking about the analysis, and then that includes a remand to reopen a sentence that has already become final. The problems with that in terms of doing that. So why is this sentence final if it's on appeal? I mean, you're appealing a part of the criminal sentence, which is the restitution. We are appealing the restitution order. In order to have appealed, or for the government to have appealed, the sentence other than the restitution order under the special provisions of 366.3 and 4, there would have had to have been a notice of appeal filed within 14 or 30 days. That was not done. So suppose, though, just to follow through on that thought, we found no flaw in the restitution order. Then the government wouldn't be entitled to say in the absence of a cross-appeal that there should also be a fine because they forfeited that by not filing a cross-appeal. But you've invited us to open the sentence back up again. I'm looking at the actual sentencing documents attached to your brief, and one aspect of the sentence is restitution, and it's initially said the restitution will be determined by the court at a later date, and, of course, then the later date comes. But it's part of the criminal sentence. Well, that holding would mean, then, Your Honor, that, in fact, a defendant who did not appeal their original sentence and the 14 days or 30 days passed, whether you're talking about the defendant or the government, and there was a subsequent restitution order, that ruling would thus lead to the conclusion that the defendant, for example, could wait until the restitution order was entered and then has 14 days to appeal the entire sentence. I am not aware of any such ruling or any such holding that would allow that, but that is the flip side of that conclusion. I understand the court's concern about this, and at the restitution hearing there was actually a long discussion about what the ill-gotten gains were, and that is a possible alternative to the figure that the court actually reached, which was basically having these defendants indemnify Bank of America for all of their losses, losses which, in fact, go back to not only their conduct but the fact that they, within two weeks of knowingly entering into these extremely flimsy, at best, documents, transferred them to Fannie Mae. In the court's order, in the district court's order, there's a suggestion, for example, what I'm leading to is that, in fact, it wasn't the intention of Bank of America to lose its own money. No, it wasn't. Well, of course not. Do you happen to know, by the way, when these loans are first given to Fannie Mae, is this one of these 90 cents on the dollar sort of thing? Does the record reflect how much Fannie Mae paid and then how much Bank of America, when they have to take them back, paid? Your Honor, other than the representations of the government regarding the quite large settlement that Fannie Mae entered and the transfer of these 16 houses back to Bank of America from Fannie Mae, we were unable to gain any information regarding those types of issues. And I can tell you, though it's not in the record, it was requested and it was questioned over and over again, could we please be in contact with someone from Bank of America? Now, I do think it's important to mention this affidavit, Exhibit 4, which was submitted by the government and apparently signed by Robin Miner. The content that I believe impacts restitution the most is the statement that these loans would not have been issued had Bank of America known that, in fact, the down payment was coming from the real estate company. So why is there no follow-up on this affidavit? The judge says, you know, you can file supplemental briefs on any issues raised during the hearing and anything else you want to talk to me about with respect to restitution. This affidavit seems very flimsy, indeed, to me. I mean, it seems stunning, actually, in its lack of detail. But it seems like the defendants dropped the ball on it. Well, actually, Your Honor, as we cited in our brief, we discussed the affidavit because we were just presented it at that moment in court. We did discuss it. We raised the issues that we're briefing today. Well, I heard that, but you didn't. The judge invites you to follow up, though. Yes, and I believe, actually, I had filed, and I did not file another brief. However, I had filed a 20-page brief prior to the hearing, and virtually every issue was already addressed. Mr. Beamon did, in fact, file a supplemental brief, and he again discussed the affidavit in his brief. In the hearing, I see criticism of it. I don't see an objection to the district court's consideration of it. Well, Your Honor, that may be true that we allowed it to come in, but we're talking about a sentencing hearing. The court can consider virtually anything it wants to at sentencing. But the question becomes, is it reliable enough for the court to reach the decision it did based on the content of that affidavit? Of course, and I was looking for that objection, and I didn't see it in the transcript. Did I miss it, or did it come later? What happened? Your Honor, it was raised that there were questions. Who is this person? What is her ability to make the statements that she is? And those are cited in our brief, Your Honor. Now, no one said we object to the court, excuse me, that the court cannot rely on this for any purpose, because, in fact, the affidavit does suggest that the affiant may have had sufficient knowledge to attest to the chart that's attached to the affidavit with the figures. But we have no basis for her conclusion that these loans would not have been granted. Well, what about the conclusion the district court pointed out that your client's conduct is consistent with the affidavit because they worked so hard to conceal the source of the down payments? Well, I think actually it's not a fair assessment of the situation, and I'll tell you why. Francisco Rodriguez, for example, is mentioned in the transcripts. Now, he is not one of the houses that is the 16th, but he is one of the 45 houses, and he was one of the 37 houses that actually the government pulled their request on restitution on the day of the hearing. Mr. Rodriguez was actually convicted of making a false statement because he had a gift letter purportedly from his mother that she was going to be making the down payment. And then again, the down payment did not come from his mother. I think that's really important because it shows that it's not true that Bank of America would not have granted the loan simply because someone else was paying the down payment. We also have evidence that... Sorry, I don't follow your logic. What did I...? There is evidence in the record that Bank of America was giving loans to people who were not paying their own down payments. But if he submitted a false gift letter... He did, but they accepted the gift letter, which was coming not from the defendant for his down payment. My point is that there is evidence that Bank of America was granting loans regardless of who paid the down payment. Well, of course. The Bank of America was very crooked. They were whacked with a $9 billion fine by the government. Absolutely, Your Honor, and we do point that out. Again, we pointed it out to the court, the district court, and we pointed it out again here. Bank of America should not be getting $893,000. Is there any realistic prospect of collecting any of this? You mean are there assets? Yes. Well, certainly people pay for the rest of their lives on restitution. At this point in time, as the finances of all of the defendants show, that they are not very liquid. They all have financial problems. Whether some of that money... In fact, we've already had some issue regarding my client's bond being forfeited to go to restitution. So yes and no, yes and no on that. There might be some assets. Right, some. I see that I'm into my rebuttal time, so I may save that time. Thank you. Sure. Mr. Whalen. Thank you, Your Honor. Good morning. May it please the court. My name is Nathaniel Whalen, and I'm here on behalf of the United States. Your Honors, the defendants are not all in the same position here, as defense counsel started her brief by saying. Mr. Litos pled guilty pursuant to a written plea agreement. He agreed not to appeal any component of a sentence for the manner in which it was determined. He's waived his right to bring this appeal, and this court should dismiss it pursuant to the waiver. When it comes to appellate waivers, this court engages in a two-step analysis. First, ask whether defendant knowingly and voluntarily entered into the agreement. You know, Mr. Whalen, we understand this, and we have the non-presidential case in Van Til that used the same language. But I don't know who's saving the trees or whatever. Why not say, you know, incarceration, supervised release, fines, and restitution? It's so much more clear, and this all components is leading us into all of this. It seems to me entirely. What could that possibly take? One more line of text? Your Honor, it's a good question, and Your Honor actually asked my co-counsel that in the Van Til case. I probably did. Here we are again, though. I understand. What the answer was then and the answer remains now is if you start including specific components of the sentence. But there are only so many components as a matter of law that the sentence includes. Sure, Your Honor. There's the fine. There's the restitution. There's the supervised release. And there's the incarceration. Well, and there's the special assessment, which you and I just forgot.  Number five. Sure. What else is on the list? Well, Your Honor, this appeal waiver also talks about not appealing the manner in which the components of your sentence are determined. That's all right. But let's define the term all components of the sentence. It's a finite set. You've suggested special assessment, which is so nondiscretionary that I'm not even sure a waiver would mean anything. But you're inviting this very kind of appeal because restitution, as defense counsel is pointing out, is something that's kind of quasi-civil, quasi-criminal. Sometimes the government's entitled to bring entirely stand-alone restitution proceedings. Why not just say so? And then if you want to enforce these appeal waivers, you've got something very solid to base your position on. Well, Your Honor, we have something solid to base our position on, and that's this Court's opinions. This Court has said components of your sentence include restitution, and this Court in Warden, which defense counsel cites in their opening brief, said restitution is a part of your sentence. Well, that's fine and dandy as a piece of law, but we need to be sure that when people are waiving something as important as a right to appeal or as a right to bring a post-conviction proceeding, that they're doing so knowingly, and that's where you get into, you know, there's this fuzzy word, all components of my sentence, and our people like, you know, these folks, Mr. Leitos in particular, are going to know that. It's so easy to say it and make it clear. And if Your Honor's reversed its previous course and decides the components of your sentence doesn't include restitution? No, that's not what I'm saying. Let's assume components does include restitution.  Well, Your Honor, if Mr. Leitos didn't know what restitution, if the restitution is a component of his sentence, then he's arguing he didn't knowingly enter into the plea agreement. Right. Well, the proper remedy with that is to unwind the plea agreement and remand. Yeah, I agree with that. He says he doesn't want to do that. He says in his reply brief on page 11 that he's not trying to unwind it. He doesn't dispute that he knowingly and voluntarily entered into it. So if he had a question, he could have asked the magistrate judge at the time. When you look at our plea agreement as a whole and don't take one isolated subsection of paragraph 7, it tells him the restitution will be determined by the sentencing judge and he's going to have to pay that restitution. Why does the government want the Bank of America to get this money? Because they were victims. They're crooks. No, you don't understand. Your Honor, I do understand the courts. You don't understand. They knew this was a joke. A joke on their face. Julius Horton, nine new mortgages in a four-month period. Your Honor, I understand. Seven new mortgages in a two-and-a-month. The government seems to be totally asleep. I don't believe that's right, Your Honor. I understand your concern about Bank of America not following through on the representations made on the agreements. Bank of America, with the other banks in this period of time, were crooks. Well, Your Honor, that might be so. And look at the immense fine that was levied on the Bank of America. I agree with that. So why did they get the $893,000? Because they're still victims of these defendants' frauds. I think the government really fell down on the job. Your Honor, a crook can still be a victim of a fraud. You can have a drug dealer who was defrauded by someone. No, I don't buy that. Well, the definition in the mandatory victim restitution. When I say they're crooks, they know exactly what is going on. They know that these are phony loans. Phony because the money is not being paid by the person who is the ostensible borrower. Well, Your Honor, they didn't know that the down payment was being paid by the defendants. And that's where the rubber hits the road, if you will, in this appeal, which is the bank said if we had known that you, the defendants, were making the down payment instead of the buyer, we wouldn't have issued the loan. I don't believe that, and I don't think you should believe that. I think the government is being extremely gullible because when they look at nine new mortgages in a four-month period by some guy named Julius Horton, they're going to wonder, what's this guy? How is he getting nine new mortgages in four months? Who is this person? Is this some billionaire or is this some nobody? And, of course, it's nobody. So they don't investigate. They don't inquire. Banks are supposed to be responsible in lending money, right? And they're not. Well, Your Honor, it's not that we don't believe it. The defendants themselves acknowledge that the bank – Mr. Litos, during his testimony, says there's a high probability the bank would have denied the loans if they had known we, the defendants, were providing the down payment to the bank. He understands the importance of the down payment. No, you don't understand. The point is the bank knew nine mortgages in four months, seven mortgages in two and a half months for some other guy, right? A woman, six mortgages in a 10-day period? Sure. That doesn't raise a flag for a bank? Your Honor, that very well might have raised a flag, and as we note in our brief, it probably should have. They probably should have investigated. So at last we know they didn't investigate. That's correct. So where's the government? Because what they were doing, Your Honor, is they're relying on the defendant's statements that the buyers are providing the down payment. Look, when you see six mortgages to Melissa Hurtado in a 10-day period, you're a bank examiner, you look at that, you say, what? Six mortgages in a – who is this? Is this a billionaire of some sort? And they do nothing. And the government does nothing. The government says, oh, yeah, well, I didn't know. Well, Your Honor, you absolutely – And the reason they do nothing is because they know they're just going to sell the paper to Fannie Mae. Well, Your Honor, the reason they don't do anything is because the buyers made the down payment, and so they have money in their hands. They believe the buyer has some vested interest in this property now, and our expert talks about that. There's one thing to say, yes, this buyer has a million dollars in assets, this buyer makes a million dollars a year. The bank might say, sure, that's a great candidate for a loan. But now that same buyer comes back and says, well, but I can't make the down payment. At that point, it's entirely reasonable the bank's going to say, no, we're not going to issue the loan. What the bank here says is if we had known these buyers weren't providing the loans, we wouldn't have issued the loans. No, you keep missing the point. It's not if we had known. We did not investigate. We saw suspicious activities here, and we did nothing. Your Honor, they saw. And the government is indifferent. They're supposed to regulate banks. Your Honor, they did. Instead, you let them get away with, you know, they didn't know this was, this is, what, this started in 2007, right? The great period of the collapse of the financial system of the United States. Your Honor, I Huge fines levied against these banks. I understand the court's concerns about the misrepresentations made on the applications. The bank should have investigated that. What the bank says, though, and the issue in this case is the source of the down payments. That is what the bank says we relied on. And that's amply supported by the testimony. But you say they say we should have investigated. No, I'm sorry, Your Honor. If I said that, I apologize. Well, I apologize. What the bank says is we relied on the defendant's statements that the buyers were providing. But there was suspicious stuff. There was suspicious stuff, but there wasn't anything suspicious about the down payments, because the defendants took great steps to conceal the down payments. And you might, as a bank, seriously have issues about an application, but be willing to approve the loan when the defense went away. So you're saying, essentially, part of the bank's fraudulent behavior is to collect all these down payments and then sell the money. So I should have added that. Then sell the rest of the paper to Fannie Mae. So they sit there with the cash in hand from the down payments, and they get whatever number of cents on the dollar they get for the sale of the paper. I'm not saying that the bank engaged in fraudulent activity, Your Honor. But you are saying that they collect the down payments. They're happy to have that money, because that's money. I mean, just cash on the barrelhood, money. And they get whatever they get for selling the paper. They're happy to have the money because it tells them that the buyer has some vested interest in the property. And so they have at least that minimal assurance that the buyer isn't going to let it go into disarray. But they don't care about the long-term interest of the property. The bank doesn't keep the down payment, does it? The down payment goes to the defendants, doesn't it? The sellers of the property. Your Honor, the bank, I believe, and I don't know this. It's reflected in the record. But the down payment would go towards part of the loan. Well, the sellers get paid. Say it's a $200,000 property, and 20% is down $40,000. So the sellers get $200,000, and then it's up to the bank to decide how that happens. So some of it's the down payment, some of it's the mortgage. But the mortgage gets sold to somebody else. That's what Judge Hamilton, I think, is saying. And if I meant to say that the bank physically has the money in their accounts, I apologize. That's not what I'm trying to represent. What I'm trying to represent is the fact that these defendants, I'm sorry, the buyers are able to make the down payments is a big issue for the bank. And that's what Mr. Litos testified to. That's what the expert testified to. That's what Ms. Harris testified to. And I think it's reflected in the defendant's actions. They're willing to make these ridiculous statements on the loans for the buyers. But look at the steps they took to conceal the source of the money. But they can't care about it that much with the list that Judge Posner was reading off of these mortgage after mortgage after mortgage all under there. It's not like they were even shopping banks. It's all Bank of America. It's all in their records. Well, Your Honor, the district court who sat through this trial and reviewed the evidence found credible this affidavit by Ms. Minor where she said the bank. This is a terrible affidavit. We don't know what her job was. We don't know why she might have been responsible for this. We don't know anything about this. I assume it's a woman. I don't know who the heck she is. And, Your Honor, that's issues the defendants could have raised had they objected to the affidavit down below. We don't know who signed it or what level of knowledge that person had about events going on in 2007 or 2008. They raised an objection. They objected to the weight of what she says in there. They don't object it to be so unreliable that it violates their due process rights if the district court relied on it. That's what they're arguing now. And if you look at page 173 and 174 of the evidentiary hearing, that's where the government admits this affidavit without any objection. Now, if this court believes the district court abused its discretion on relying on this affidavit and turning an eye to a lot of the testimony about the importance of the down payments, that is the issue in front of this court for two of these defendants. It's not the issue for Mr. Litos, who has waived his right to appeal. Mr. Whalen, what do you think about the prospect procedurally, if we were to find there's a problem with ordering this restitution for the bank to send it back, in essence, so that the judge could shift that to a fine? Your Honor, I think if this court remanded, it would be for a full resentencing. We didn't ask for a fine in our sentencing memo, and so we would, if this court remanded for resentencing, have to consider the issue, but we also didn't cross-appeal. Defense counsel is right about that. There was no fine issued. Yeah, but if there were assets, as a sentencing judge, if there are assets available or if there's a stream of income in the future, in essence, do I want it to go to a victim? Do I want it to go to the government? Those are the choices you know very well, and as Judge Simon knows very well. So I would think that that would, it has at least, to me, some pragmatic appeal, if that's the resolution here. Do you see any legal objections to it? I don't, Your Honor, and I unfortunately didn't cite it and can't come up with it off the top of my head, but I believe there is an opinion by this court where it found the district court didn't have the authority, a pre-Dolan opinion, where it found the district court didn't have the authority to order restitution and remand it for a full resentencing. If the court would like, I'd be happy to submit that as a supplemental. I'd be happy to research and confirm that opinion does say what it says and submit it as a supplemental filing post-argument. That would be all right. If you both would like to address that within seven days. And just quickly to go to Judge Posner's point, I think, Judge Posner, you hit the nail right on the head, which is the defendants shouldn't be able to retain this $893,000. That's what they're asking for in this appeal. They're saying because we were so fraudulent, we shouldn't have to pay for the bank's loss, and there's no dispute the bank actually suffered the loss in this case. I don't believe it. Your Honor, doesn't believe that the bank suffered a loss and that they lost $893,000? That issue is uncontested. It's supported by records in this case where the bank filed civil actions against the buyers for foreclosure. So they are down $893,000 when you take into account the amount of the loan. I regard them as accomplices in the fraud. And, Your Honor, I understand the court's opinion. I don't believe the district court abused its discretion in finding the bank was a victim for the purposes of restitution because they relied on the source of the down payments. So with that in mind, we ask that you dismiss Mr. Litos' appeal and affirm otherwise, unless the court has any further questions. Thank you very much. Thank you, Your Honors. Ms. Conner. Yes. First of all, the down payment does then, in essence, remain with the seller of the property. So that they put up the money and then, in essence, they get it back. And so that money does not go to the bank. It's never gone to the bank in terms of the down payment. So it's not a financial security, in essence, for the bank, as much as the argument by the government is that they have skin in the game. I would point out, though, that at the trial of the Tartianos, the expert that the government refers to also testified that during this time period that there were, in fact, down payment assistance programs. And I believe her testimony suggested that these same individuals may have been eligible for those programs. So I just mention that to underscore that this blanket statement that if the money is not coming from the buyers, the banks would not have granted these loans, is simply not supported by the record. I would also, in terms of the waiver, the- Well, it's one thing for it to be coming from somebody on the buyer's side, whether it's the buyer, the buyer's mother, the buyer's rich uncle, or somebody. It's quite another thing for it to be coming from the seller. I understand the fraud. We've admitted the fraud. But I point out to the court that with the victims-I'm not victims, excuse me- with the down payment assistance programs that were in place at the time, and if the court were to look at some of these applications, you'd find that there is a suggestion that even at the closings that the down payment assistant representative was present, though the proper channels were not used, that down payments did come from the defendants, that, in fact, the bank would have accepted down payments through the down payment assistance program. And, again, that doesn't give any skin in the game to the buyer. What are those down payment assistance programs? Where does the money come from? There were several locally. There were several locally. And I'm sorry, the name of the one? Coalition of Concern. Coalition of Concern. You'll see that name. These are not-for-profit groups? It's a not-for-profit group. And, in essence, that down payment is actually paid by the seller can actually fund the not-for-profit with those down payment assistance programs. So I think it's a huge overstatement for the government to suggest that these banks could care less where the money came from. Also, and I see my time is up, I do want to point out on those applications that if you track the applications, the nine, the seven, the four applications for each individual, you'll see that the figures are so outrageous that the bank takes and accepts that there's no reflection for anyone paying any down payments. So if the bank really cared about where the down payment was coming from, they certainly would have paid attention to their own information about the fluctuations in the bank's accounts for these buyers. Thank you. Okay. Thank you very much, Ms. Conner. Thank you, Mr. Whaley. We will take the case under advisement.